THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
February 23, 2010

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Safer, Inc.
v.
OMS Investments, Inc.

_____

Opposition No. 91176445
to application Serial No. 78898038
filed on June 1, 2006

_____

Marsha G. Gentner and Leesa N. Weiss of Jacobson Holman PLLC
for Safer, Inc.

Susan E. Hollander of Manatt, Phelps & Phillips, LLP for OMS
Investments, Inc.

_____

Before Walters, Kuhlke and Bergsman, Administrative
Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

OMS Investments, Inc. ("applicant") filed an intent-to-
use application for the mark DEER-B-GON, in standard
character form, for an "animal repellant used to repel deer
and other ruminant animals and rabbits," in Class 5.

Safer, Inc. ("opposer") filed a notice of opposition
against the registration of applicant's mark on the ground
of priority of use and likelihood of confusion pursuant to
Section 2(d) of the Trademark Act of 1946, 15 U.S.C.
§1052(d). Specifically, opposer alleged that it is the

owner of Registration No. 2236673 for the mark DEER AWAY[1] and Registration No. 2867421 for the mark DEER AWAY PROFESSIONAL,[2] both in typed drawing form, and both for "repellant for repelling deer, other big game and rabbits," in Class 5. Opposer disclaimed the exclusive right to use the word "deer" in Registration No. 2236673.

Applicant, in its answer, denied the salient allegations in the notice of opposition.

Preliminary Issues

A.   Whether likelihood of confusion with opposer's DEER-OFF trademark was tried by implied consent?

As indicated above, in the notice of opposition, opposer claimed ownership of the federal registrations for the marks DEER AWAY and DEER AWAY PROFESSIONAL. During its testimony period, opposer filed a notice of reliance on status and title copies of the registrations.

Applicant filed a notice of reliance on opposer's responses to applicant's interrogatories. In interrogatory No. 8, applicant requested opposer to identify any trademark opposer uses which contain the words "Deer" or "Away." Opposer identified, *inter alia,* DEER AWAY, DEER AWAY PROFESSIONAL and DEER-OFF. Opposer's DEER-OFF mark was also referenced in some of the documents opposer produced during

---

[1] Issued April 6, 1999; affidavits under Sections 8 and 15 accepted and acknowledged.
[2] Issued July 27, 2004.

discovery pursuant to Fed. R. Civ. P. 33(d) and applicant subsequently made of record during its testimony period.

In its rebuttal testimony period, opposer introduced a status and title copy of Registration No. 2700224 for the mark DEER-OFF for "packages, bottles, and/or spray bottles containing a fluid composed of all natural liquids which when applied to or sprayed upon flowers and plants deter deer from destroying those flowers and plants," in Class 5.[3] Although opposer did not seek leave to amend its pleading to claim ownership of the DEER-OFF mark and registration and to assert likelihood of confusion based on this mark, in its brief on the case, opposer referred to the DEER-OFF registration and mark as if it had pled ownership of the mark and registration in the notice of opposition. In other words, there was no separate Rule 15(b) motion to amend the pleading or reference to Rule 15(b) in opposer's brief; there was only a discussion of the mark. Applicant, in its brief, objected to any reference to the DEER-OFF mark and registration on the ground that it was not pled by opposer.

Opposer argues that because applicant made the DEER-OFF trademark "of record," applicant made opposer's "use and registration of that mark a triable issue in this proceeding."[4]

---

[3] Issued March 25, 2003; affidavits under Sections 8 and 15 accepted and acknowledged.
[4] Opposer's Reply Brief, p. 3.

> Applicant, having itself put Opposer's DEER-OFF mark into evidence, cannot now claim that it was surprised or prejudiced by its inclusion in this proceeding.  Accordingly, Opposer clearly was entitled to submit in its rebuttal testimony period a status and title copy of its registration, no. 2,700,224, for same and, thereafter, rely on it in its trial brief.[5]

Opposer concludes that because applicant has treated the DEER-OFF mark and registration as being of record, the pleadings should be deemed amended in accordance with Fed. R. Civ. P. 15(b) to include a likelihood of confusion claim based on this mark.[6]  When opposer filed its brief, it did not file a separate motion to amend the notice of opposition to conform to the evidence produced at trial.  Nevertheless, we construe opposer's discussion of the DEER-OFF mark in its main brief, applicant's objection to the discussion in applicant's main brief, and opposer's response to the objection in opposer's reply brief as having effectively briefed the question.

Implied consent to the trial of an unpleaded issue can be found only where the nonoffering party (1) raised no objection to the introduction of the evidence on the issue, and (2) was fairly apprised that the evidence was being offered in support of the issue.  *Morgan Creek Productions Inc. v. Foria International Inc.,* 91 USPQ2d 1134, 1138 (TTAB

---

[5] *Id.*
[6] *Id.*

2009); *H.D. Lee Co. v. Maidenform Inc.*, 87 USPQ2d 1715, 1720-1721 (TTAB 2008).

> The question of whether an issue was tried by consent is basically one of fairness. The non-moving party must be aware that the issue is being tried, and therefore there should be no doubt on this matter.

*Morgan Creek Productions Inc. v. Foria International Inc.*, 91 USPQ2d at 1139.

In this case, applicant raised an objection to "all mention of, reference to or reliance upon" opposer's DEER-OFF trademark and registration.[7] Applicant initially introduced the registration of the DEER-OFF mark into the record "as it establishes that Opposer disclaimed the exclusive right to use the word 'deer' apart from the mark as shown,"[8] not to prove the ownership and validity of opposer's DEER-OFF registration. Because opposer had never asserted ownership of the DEER-OFF registration, applicant was not aware that opposer was going to rely on that mark and registration to prove likelihood of confusion. The fact that applicant submitted opposer's response to an interrogatory to show the opposer had disclaimed a portion of its mark does not show that applicant was aware that the issue of likelihood of confusion with respect to that mark was being tried, nor does it show applicant's consent to the

---

[7] Applicant's Brief, p. 10.
[8] Applicant's notice of reliance, p. 6.

trial of this issue. Opposer cannot show that the issue was tried by submitting a copy of its registration during its rebuttal testimony period.[9]

Opposer knew full well what marks it owned at the time it filed the notice of opposition. If it wished to rely on a likelihood of confusion claim with DEER-OFF, it should have pled the mark and registration in its original notice of opposition or, at a minimum, sought leave to amend its notice of opposition after it served responses to applicant's discovery that referenced the mark. In this regard, opposer had many opportunities to inform applicant that it was going to rely on the DEER-OFF trademark to prove likelihood of confusion: when it filed the notice of opposition and when it identified the DEER-OFF mark in discovery responses. However, opposer never told applicant that it was going to rely on the DEER-OFF mark and registration to prove likelihood of confusion until opposer filed its rebuttal notice of reliance. In fact, in its response to applicant's interrogatory No. 8, opposer objected to identifying any trademark opposer uses containing the word "Deer" or "Away" on the ground that the interrogatory is irrelevant. Thus, opposer's own actions prior to trial would not have given applicant any reason to

---

[9] Even if the registration had been properly pleaded, introduction of the registration during opposer's rebuttal testimony period would have constituted improper rebuttal.

believe that opposer intended to rely on its DEER-OFF mark. *Fossil Inc. v. Fossil Group,* 49 USPQ2d 1451, 1455 (TTAB 1998).

In view of the foregoing, we find that applicant was not aware that opposer intended to rely on its DEER-OFF mark to prove likelihood of confusion until opposer filed its rebuttal notice of reliance, .  This was too late a point to show that the issue of likelihood of confusion with respect to this mark was tried.  On the contrary, it would be unfair to permit opposer to rely on the DEER-OFF trademark and registration at this late date.  *See Sunnen Products Co. v. Sunex International Inc.,* 1 USPQ2d 1744, 1746 (TTAB 1987); *The United States Shoe Corp. v. Kiddie Kobbler Ltd.,* 231 USPQ 815, 817 (TTAB 1986); *Long John Silver's, Inc. v. Lou Scharf Inc.,* 213 USPQ 263, 266 (TTAB 1982).  We conclude that likelihood of confusion with respect to this mark and registration was not tried by either implied or express consent as a result of applicant's submissions at trial. Applicant's objection to the rebuttal notice of reliance and to opposer's references in its brief to the DEER-OFF registration is  sustained. We will make our determination of likelihood of confusion based solely on the basis of opposer's registrations for the marks DEER AWAY and DEER AWAY PROFESSIONAL.  However, we will otherwise admit the

DEER-OFF registration for whatever probative value it may have.

B.  <u>Whether incontestable status is evidence of a mark's strength for purposes of determining likelihood of confusion</u>?

Opposer argues that its "incontestable registrations also constitute evidence of the strength of Opposer's DEER AWAY and DEER-OFF marks."[10]  Applicant, however, contends that "incontestable status does not make a weak mark strong."[11]

Appellate courts are split as to the effect of incontestability on the strength of a registered mark.  Some presume that incontestable status is an indicia of strength. *Sports Authority Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 39 USPQ2d 1511, 1514 (2nd Cir. 1996); *Dieter v. B & H Industries of Southwest Florida, Inc.,* 880 F.2d 322, 11 USPQ2d 1721, 1726 (11th Cir. 1989); *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 5 USPQ2d 1944, 1946 (6th Cir. 1988).  Other courts hold that incontestable status refers to the validity of the registration, not the registered mark's degree of strength.  *Lone Star Steakhouse & Saloon v. Alpha of Virginia,* 43 F.3d 922, 33 USPQ2d 1481, 1490 (4th Cir. 1995); *Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 8 USPQ2d 1237, 1240 (9th Cir. 1988); *M-F-G Corp.*

---

[10] Opposer's Brief, p. 8.
[11] Applicant's Brief, p. 18.

*v. EMRA Corp.,* 817 F.2d 410, 2 USPQ2d 1538, 1539 (7th Cir. 1987); *Oreck Corp. v. U.S. Floor Systems, Inc.,* 803 F.2d 166, 231 USPQ 634, 637 (5th Cir. 1986).

Incontestability concerns a statutory presumption flowing from a mark that has been registered for more than five years (*i.e.,* a registration that has been registered for more than five years is conclusive evidence of the registrant's ownership of the mark, the validity of the registration, and the registrant's exclusive right to use the mark in commerce). Section 33(b) of the Trademark Act of 1946, 15 U.S.C. §1115(b).

Neither our primary reviewing court, the Court of Appeals for the Federal Circuit, nor its predecessor, the Court of Customs and Patent Appeals, has expressly addressed whether the incontestable status of a federally-registered mark is an indicia of strength in the likelihood of confusion analysis.[12] However, the CCPA has recognized that trademark rights are not static and that the strength of a mark may change over time. *Jiffy, Inc. v. Jordan Industries, Inc.,* 481 F.2d 1323, 179 USPQ 169, 170 (CCPA

---

[12] We note that opposer's counsel prosecuted two oppositions resulting in nonprecedential decisions where the Board held that incontestable status does not make a registered mark strong for purposes of determining likelihood of confusion. *Tensar Corp. v. McElroy Metal Mill* (Opposition No. 91174290, March 17, 2009) ("We reject opposer's argument that incontestable status alone dictates that the MESA mark is strong and entitled to broader protection than otherwise may apply"); *Panelfold v. ChemRex,* (Opposition No. 91103270, July 12, 2002) ("the fact that a

1973) ("a weak mark need not remain a weak mark forever. Development of association with the user as a source of the goods through continued sales and advertising of the goods may turn a 'weak' mark into a strong, distinctive trademark"); *Standard International Corp. v. American Sponge and Chamois Co., Inc.*, 394 F.2d 599, 157 USPQ 630, 631 (CCPA 1968) ("a mark which is initially a weak one may, by reason of subsequent use and promotion, acquire such distinctiveness that it can function as a significant indication of a particular producer as source of the goods with which it is used"). Because trademark rights are not static, an inherently weak mark may become a strong mark through extensive promotion.

The Board has previously held that statutory presumptions do not affect the likelihood of confusion analysis. *Byk-Gulden, Inc. v. Trimen Laboratories, Inc.*, 211 USPQ 364, 368 (TTAB 1981), *quoting Hyde Park Footwear Co., Inc. v. Hampshire-Designers, Inc.*, 197 USPQ 639, 641 (TTAB 1977):

> The statutory presumptions, however, do not answer the question of whether applicant's mark, for the goods identified in the application, so resemble either of opposer's marks as to be likely to cause confusion, mistake or deception. The registrations alone are incompetent to establish any facts with regard to the nature or extent of

---

registration has achieved incontestable status does not make a mark 'strong'").

10

> opposer's use and advertising of its
> trademarks or any reputation they enjoy
> or what purchasers' reactions to them
> may be.

*See also Martha White, Inc. v. American Bakeries Co.,* 157 USPQ 215, 217 (TTAB 1968) (opposer's registration is not evidence of the nature and extent of opposer's use and advertising of its mark and, thus, is not probative of consumer reaction to the mark no matter how long it has been registered). Accordingly, the fact that opposer's federally-registered trademark has achieved incontestable status means that it is conclusively considered to be valid, but it does not dictate that the mark is "strong" for purposes of determining likelihood of confusion. McCarthy On Trademark and Unfair Competition §§11:82 and 32:155 (4th ed. 2009).

C. Whether opposer's Exhibits 5-40 comprising documents published by universities, state institutions and other private entities obtained from the Internet are admissible pursuant to Trademark Rule 2.122(e)?

In opposer's second notice of reliance, opposer proffered publications by federal and state agencies, universities and certain private entities. Pursuant to the information provided in the notice of reliance, the publications were obtained from the Internet. Applicant objected to the admissibility of opposer's exhibit Nos. 5-40 on the ground that the documents are not publicly available printed publications in accordance with Trademark Rule

2.122(e) and on the ground that documents obtained through the Internet are not self-authenticating and, therefore, not proper subject matter for introduction by notice of reliance.[13]

Opposer argues that applicant waived its objections to opposer's Exhibits 5-40 because applicant introduced electronic versions of similar studies by universities and state agencies through a notice of reliance. However, applicant introduced its Exhibit Nos. 6-9 through a notice of reliance pursuant to Trademark Rule 2.120(j)(3)(i), providing for the introduction of interrogatory responses through a notice of reliance. Applicant's exhibit Nos. 6-9 were documents identified by opposer in response to applicant's interrogatory No. 18 pursuant to Fed. R. Civ. P. 33(d). Because applicant introduced its exhibit Nos. 6-9 through a notice of reliance pursuant to Trademark Rule 2.120(j)(3)(i), not Trademark Rule 2.122(e), applicant did not waive its objection to the admissibility of opposer's documents through Trademark Rule 2.122(e).

Trademark Rule 2.122(e), 37 CFR §2.122(e), in pertinent part, reads as follows:

---

[13] Opposer's Exhibits 5-40. In applicant's objections to opposer's evidentiary record, applicant objected to opposer's exhibit Nos. 5-38 and omitted exhibits 39 (private entity publication) and 40 (university publication). We consider this to be an oversight and include these two exhibits in our discussion.

> Printed publications, such as books and periodicals, available to the general public in libraries or of general circulation among members of the public or that segment of the public which is relevant under an issue in a proceeding, and official records . . . may be introduced in evidence by filing a notice of reliance on the material being offered.  The notice shall specify the printed publication (including information sufficient to identify the source and the date of the publication).

"Printed publications" that are in "general circulation" may be introduced into evidence through a notice of reliance.  "Documents which constitute printed publications are essentially self-authenticating, eliminating the usual requirement that evidence be authenticated prior to admission."  *Boyds Collection Ltd. v. Herrington & Co.*, 65 USPQ2d 2017, 2020 (TTAB 2003).[14]

The Board generally finds that a document identifying its publication date and source may be introduced into evidence pursuant to Trademark Rule 2.122(e) if it is in general circulation.  *Paris Glove of Canada Ltd. v. SBC/Sporto Corp.*, 84 USPQ2d 1856, 1857 (TTAB 2007) (article from a trade magazine is admissible under 2.122(e) because

---

[14] Documents submitted under notice of reliance pursuant to Trademark Rule 2.122(e) are generally admissible and probative only for what they show on their face, and not as proof of the matters asserted therein. *Boyds Collection Ltd. v. Herrington & Co.*, 65 USPQ2d at 2020 n.8; *Exxon Corp. v. Fill-R-Up Systems, Inc.*, 182 USPQ 443, 445 (TTAB 1974); TBMP §708 (2nd ed. Rev. 2004) and the cases cited therein.

"[o]n its face, it identifies the publication and the date published"); *Harjo v. Pro-Football, Inc.*, 50 USPQ2d 1705, 1722 (TTAB 1999), *rev'd on other grounds*, 284 F.Supp.2d 96, 68 USPQ2d 1225 (D.D.C. 2003) (excerpts that are unidentified as to either source or date are not admissible under a notice of reliance because the authenticity of the document cannot be ascertained); *Hard Rock Cafe Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1405 (TTAB 1998) (excerpt from a newspaper or periodical is not admissible under 2.122(e) if it is incomplete, illegible or not fully identified as to its name and date of the published source); *Int'l Assn. of Fire Chiefs v. H. Marvin Ginn Corp.*, 225 USPQ 940, 942 n.6 (TTAB 1985), *rev'd on other grounds*, 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986) (excerpts from the Lexis/Nexis database were admissible through notice of reliance because the materials "clearly identify the excerpted articles by their dates of publication and sources, all of which are readily available in published materials"); *see also In re National Data Corp.*, 222 USPQ 515, 517 n.3 (TTAB 1984), rev'd on other grounds, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985) (magazine articles obtained through Lexis/Nexis search admissible because they were clearly identified and therefore there was "no credibility problem"); *In re Capital Formation Counselors, Inc.*, 219 USPQ 916, 918 n. 3 (TTAB 1983) (Lexis/Nexis articles are clearly identified by name

and date therefore applicant could have easily checked the articles).

Rule 2.122(e) is intended to expedite and facilitate the presentation and evaluation of evidence.

> [Rule 2.122(e)] is intended to facilitate the introduction of books and publications for what they show on their face subject to the safeguard that the party against whom the evidence is offered is readily able to corroborate or refute the authenticity of what is proffered.  The assumption underlying the rule is that a party is or may readily become familiar with printed matter in libraries open to the public or in general circulation.  The burden of showing public availability, in case of reasonable doubt, lies on the proponent of the evidence.  Private promotional literature is not presumed to be publicly available in the sense of being readily accessible for inspection in libraries open to the public or of such currency that the other party is presumably familiar with it.

*Glamorene Products Corp. v. Earl Grissmer Co., Inc.*, 203 USPQ 1090, 1092 n.5 (TTAB 1979).

In applying the Trademark rules, we must recognize and adapt to changes in technology, particularly the prevalence of the Internet.  Apropos to the question of whether the Board should allow materials retrieved from Internet web pages to be introduced by notice of reliance is the discussion justifying our decision to admit newswire stories in *ex parte* appeals.

> This Board would be blind if it did not recognize that during the past fifteen

15

years, there has been a dramatic change in the way Americans receive their news. In the 1980's personal computers were in their infancy as was the transmission of news stories via the Internet. Put quite simply, we believe that communications have changed dramatically during the past fifteen years such that by now it is by no means uncommon for even ordinary consumers . . . to receive news not only via tangible newspapers and magazines, but also electronically through personal computers. Thus, it is much more likely that newswire stories will reach the public because they can be picked up and "broadcast" on the Internet. In short, while we are not saying that newswire stories are of the same probative value as are stories appearing in magazines and newspapers, we think that the situation has changed such that said newswire stories have decidedly more probative value than they did when this Board decided the *Professional Tennis Council* and *Appetito Provision* cases.[15]

*In re Cell Therapeutics Inc.,* 67 USPQ2d 1795, 1798 (TTAB 2003); *see also Research In Motion Limited v. NBOR Corporation,* 92 USPQ2d 1926, 1928 (TTAB 2009) (permitting proof of a pleaded registration by the submission of a printout of information from the electronic database records of the USPTO through a notice of reliance although not expressly authorized by Trademark Rule 2.122(d)(2) in an effort to "liberalize the means for proving a pleaded registration"); TMEP §710.01(b) (6th ed. 2009) ("Articles downloaded from the Internet are admissible as evidence of

---

[15] *In re Men's Inernational Professional Tennis Council*, 1 USPQ2d 1917 (TTAB 1986); *In re Appetito Provisions Co.,* 3 USPQ2d 1553

information available to the general public, and of the way in which a term is being used by the public");[16] Manual of Patent Examining Procedure (MPEP) §2128 (8th ed. rev. 2008) ("A reference is proven to be a 'printed publication' 'upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it'").

> We agree that "printed publication"
> should be approached as a unitary
> concept.  The traditional dichotomy
> between "printed" and "publication" is
> no longer valid.  Given the state of
> technology in document duplication, data
> storage, and data retrieval systems, the
> "probability of dissemination" of any
> item very often has little to do with
> whether or not it is "printed" in the
> sense of that word when it was
> introduced into the patent statutes in
> 1836.

In re Wyer, 655 F.2d 221, 210 USPQ 790, 794 (CCPA 1981)(quoting I.C.E. Corp. v. Armco Steel Corp., 250 F.Supp. 738, 743, 148 USPQ 537, 540 (SDNY 1966)).

---

(TTAB 1987).
[16] Although, the U.S. Patent and Trademark Office's Internet Usage Policy that appeared in the Federal Register at 64 Fed. Reg. 33056 (June 21, 1999) was addressed to use of Internet sources in ex parte examination, the policy noted that "electronic-only documents are considered to be original publications."  64 Fed. Reg. at 33063.

Likewise, the manner in which many "publications," including government documents, are maintained and circulated has dramatically changed since this Board decided *Raccioppi v. Apogee Inc.*, 47 USPQ2d 1368, 1370 (TTAB 1998) ("these printouts must be viewed simply as information available to the general public at the time opposer's counsel accessed the Internet") and even *Paris Glove of Can. Ltd. v. SBC/Sporto Corp.*, 84 USPQ2d at 1858-59 (TTAB 2007) (web pages which are not the equivalent of printed publications are not admissible under a notice of reliance). Even the USPTO no longer maintains new trademark files in printed form but rather the Office's files are in electronic form and accessible to all via the Internet, and to that extent they are both official records and in general circulation. Today some matter that was once admissible as a printed publication no longer exists in printed form (*e.g.*, new magazine "publications" that only exist online). As this trend continues, more and more "publications" will exist only online. Therefore, either the utility of the use of notices of reliance to introduce printed publications and government records will become limited, or the Board must adapt the procedure to recognize the changes in how publications and other documents are kept and "circulated."

We hold that, <u>if a document obtained from the Internet identifies its date of publication or date that it was</u>

<u>accessed and printed, and its source</u> (*e.g.,* the URL), it may be admitted into evidence pursuant to a notice of reliance in the same manner as a printed publication in general circulation in accordance with Trademark Rule 2.122(e). *Cf.* MPEP §2128 ("An electronic publication, including an on-line database or Internet publication, is considered to be a 'printed publication' within the meaning of 35 U.S.C. §102(a) and (b) provided the publication was accessible to persons concerned with the art to which the document relates"). The Board will henceforth deem a document obtained from the Internet displaying a date and its source as presumptively true and genuine. Of course, the document must be publicly available. The date and source information on the face of Internet documents allow the nonoffering party the opportunity to verify the documents. Due to the transitory nature of the Internet, the party proffering information obtained through the Internet runs the risk that the website owner may change the information contained therein. However, any relevant or significant change to the information submitted by one party is a matter for rebuttal by the opposing party.[17]

---

[17] As was true before this decision, if the parties have any question about the public availability of information obtained via the Internet, the better practice would be for the parties to stipulate that documents obtained through the Internet may be introduced into evidence through a notice of reliance for the limited purpose of demonstrating what the documents show on their face.

By this change, the Board is expanding the types of documents that may be introduced by notice of reliance to include not only printed publications in general circulation, but also documents such as websites, advertising , business publications, annual reports, studies or reports prepared for or by a party or non-party, if, and only if, they can be obtained through the Internet as publicly available documents.  This approach facilitates the introduction of matter for the limited purpose of demonstrating what the documents show on their face.  We underscore that a printout from a webpage may have more limitations on its probative value than traditional printed publications.  A party may increase the weight we will give such website evidence by submitting testimony and proof of the extent to which a particular website has been viewed.  Otherwise, it might not have much probative value.  The change in practice articulated herein does not change our practice with respect to traditional paper documents.[18]

By liberalizing the practice under Trademark Rule 2.122(e), we understand that there is an opportunity for abuse (*e.g.,* "needless presentation of cumulative evidence"

---

[18] This may create a situation where identical types of documents may be treated differently.  For example, a corporate annual report available only in paper form may not be admissible through a notice of reliance because it is not a document in general circulation, however, a corporate annual report in digital form publicly available over the Internet would be admissible through

in violation of Fed. R. Evid. 403).[19]  We emphasize that under Rule 2.122(e) the propounding party of internet documents as well as traditional publications must "indicate generally the relevance of the material being offered."  For example, it is not sufficient for the propounding party to broadly state that the materials are being submitted to support the claim that there is (or is not) a likelihood of confusion, or that the mark is (or is not) merely descriptive.  Likelihood of confusion or descriptiveness is often the only issue in a case and to simply state this fact is the equivalent of saying that the documents are relevant to the case.  Ordinarily, to meet the requirement to "indicate generally the relevance of the material being offered," the propounding party should associate the materials with a relevant likelihood of confusion factor (*e.g.,* the strength of the mark, the meaning or commercial impression engendered by the mark, etc.) or a specific fact

a notice of reliance because its publication on the Internet places it in general circulation.

[19] It is not necessary for the parties to introduce every document obtained from an Internet search especially when it includes duplicative and irrelevant materials.  As Judge Rich commented in *In re Societe Generale des Eaux Minerales de Vittel S.A.*, 824 F.2d 957, 3 USPQ2d 1450, 1451 (Fed. Cir. 1987):  "It is indeed remarkable to see the thoroughness with which NEXIS can regurgitate a place name casually mentioned in the news."  The same can be said for the ability of Internet search engines. *See also Blue Man Productions Inc. v. Tarman,* 75 USPQ2d 1811, 1817 - 1819 (TTAB 2005), *rev'd on other grounds,* Civil Action No. 05-2037 (D.D.C. April 3, 2008)("when unacceptable material, duplicative material, and material with no real probative value is removed, the amount of evidence showing recognition of

relevant to determining a particular issue, such as whether

a mark is merely descriptive.  This will ensure that any

---

opposer's mark is far less than the eleven-page listing in
opposer's notice of reliance would lead one to expect").

adverse party has been fairly apprised of the evidence it must rebut and the issue for which it was introduced.

Furthermore, if the propounding party introduces the same document to support more than one element of a claim or defense, or more than one relevant fact, the propounding party should indicate the specific element or fact supported by the document in a group of documents. For example, if printed materials or Internet web pages introduced through a notice of reliance are submitted to show the similarity of the products, the similarity of the channels of trade, and the strength of the mark, the propounding party should identify which of the documents or web pages support each element or fact (*e.g.,* plaintiff's exhibits 1-10 demonstrate the similarity of the products, plaintiff's exhibits 3-5 and 11-15 demonstrate the similarity of the channels of trade, and plaintiff's exhibits 7-8, 16 and 16-30 demonstrate the strength of plaintiff's mark). However, once a document is admitted into evidence, it may be relied on by any adverse party and considered by the Board for any relevant purpose. *Anheuser-Busch, Inc. v. Major Mud & Chemical Co., Inc.,* 221 USPQ 1191, 1192 n.7 (TTAB 1984). That is, once evidence is introduced through a notice of reliance, it is "entirely proper" for any party "to argue the probative effect" of such evidence. *Beecham Inc. v. Helene Curtis Industries,*

*Inc.,* 189 USPQ 647, 647 (TTAB 1976). *See also* Trademark Rule 2.120(j)(7), 37 CFR § 2.120(j)(7).

The failure to properly "indicate generally the relevance of the material being offered," as such an indication has been described herein, is an evidentiary defect that can be cured by the propounding party as soon as it is raised by any adverse party, without reopening the testimony period of the propounding party. If the adverse party believes that the propounding party has not met the requirement to "indicate generally the relevance of the material being offered," the adverse party must lodge an objection before the opening of the next testimony period following that in which the material was offered into the record, or risk a finding that any objection on this basis has been waived.

Even if an adverse party fails to lodge a timely objection, the Board may *sua sponte* decline to consider the proffered evidence if the notice of reliance does not specify the relevance of the materials.

Finally, we emphasize two points regarding this evidence. First, even if a party submits a proper notice of reliance detailing generally the relevance of the material being offered, it may nonetheless be objectionable under Fed.R.Evid. 403 on the ground that it constitutes a "needless presentation of cumulative evidence." Second, the

documents have little probative value. They are admissible only to show what has been printed, not the truth of what has been printed.

In its notice of reliance, opposer explains that "the attached exhibits [Nos. 5-40] submitted with this Notice of Reliance are relevant to the similarity of Opposer's and Applicant's respective marks; the issues of the strength and notoriety of Opposer's Marks; the nature of, applications, as well as the channels of trade and customers, for Opposer's goods as set forth in Opposer's registrations." Under the practice identified above, opposer's notice of reliance would not be acceptable because opposer submitted the documents to prove three likelihood of confusion elements, but did not associate each document or group of documents with a specific likelihood of confusion factor. Nevertheless, because opposer's Internet evidence is not needlessly cumulative, we do not out-of-hand reject the notice of reliance.

With the exception of opposer's exhibit Nos. 7, 16, 18, 30, 31 and 36, the documents introduced in opposer's second notice of reliance in accordance with Trademark Rule 2.122(e) are admitted into evidence. The specific exhibits noted above are not admissible into evidence in accordance with Trademark Rule 2.122(e) because there is no date on the face of the documents and there is no URL. Thus, the

documents have not been authenticated for purposes of submission by notice of reliance, nor have they been authenticated by testimony.  We also note that exhibit Nos. 30 and 31 are essentially the same document.

Also, exhibit Nos. 5 and 8-10 are admissible as copies of official records.  Fed.R.Evid. 902(5).

The Record

By rule, the record includes applicant's application file and the pleadings.  Trademark Rule 2.122(b), 37 CFR §2.122(b).  In addition, the parties introduced the testimony and evidence identified below.

A.   Opposer's evidence.

1.   A notice of reliance on certified copies of opposer's pleaded registrations showing the current status and title of the registrations.

2.   A notice of reliance on dictionary definitions, official records, printed publications, and Internet web pages filed in accordance with Trademark Rule 2.122(e).  *See* the discussion *supra.*

3.   A notice of reliance on certain of applicant's discovery responses.

4.   A notice of reliance on a certified copy of opposer's Registration No. 2700224 for the mark DEER-OFF showing the current status and title of the registration.  *See* the discussion *supra.*

5. A notice of reliance on opposer's response to applicant's interrogatory No. 18 and the documents identified therein. Opposer asserts that applicant did not submit opposer's entire response and that it has therefore submitted the entire response which in fairness should be considered so what applicant proffered is not misleading. Trademark Rule 2.120(j)(4).

B. Applicant's evidence.

Applicant filed a notice of reliance on the following items:

1. Opposer's objections and responses to applicant's first set of requests for admission.

2. Opposer's objections and responses to applicant's first set of interrogatories, including four documents produced in response to interrogatory No. 18.

3. Copies of sixteen registrations that include the suffix "B GON" or "Be-Gone" owned by applicant showing the current status and title of the registrations.

4. Copies of ten third-party registrations for deer repellants containing the word "Deer" as part of the mark.

5. A copy of applicant's previous application for the mark DEER-B-GON, abandoned for failure to file a statement of use, to show that opposer failed to object to the proposed use of the mark.

## Standing

Because opposer has properly made its pleaded registrations of record, opposer has established its standing. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

## Priority

Because opposer's pleaded registrations are of record, Section 2(d) priority is not an issue in this case as to the marks and the products identified in the registrations. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

## Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also, In re Majestic Distilling Company, Inc.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003).

A.   The fame of opposer's marks.

This *du Pont* factor requires us to consider the fame of opposer's marks. Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks

enjoy a broad scope of protection or exclusivity of use. A famous mark has extensive public recognition and renown. *Bose Corp. v. QSC Audio Products Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton,* 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Fame may be measured indirectly by the volume of sales and advertising expenditures of the goods and services identified by the marks at issue, "by the length of time those indicia of commercial awareness have been evident," widespread critical assessments and through notice by independent sources of the products identified by the marks, as well as the general reputation of the products and services. *Bose Corp. v. QSC Audio Products Inc.,* 63 USPQ2d at 1305-1306 and 1309. Although raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, raw numbers alone may be misleading. Some context in which to place raw statistics may be necessary (*e.g.,* the substantiality of the sales or advertising figures for comparable types of products or services). *Bose Corp. v. QSC Audio Products Inc.,* 63 USPQ2d at 1309.

Finally, because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal

protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark is famous to clearly prove it. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC,* 82 USPQ2d 1901, 1904 (TTAB 2007).

Opposer contends that its DEER AWAY trademarks "and products are widely known, and have achieved broad recognition" as shown by the favorable publicity and accolades the marks have received.[20]  Specifically, opposer is referring to the following publicity and accolades:

1.   A March 1, 2005 press release touting DEER AWAY as "best value among all repellants";[21]

2.   A November 1, 2006 press release announcing that opposer's DEER AWAY and other animal repellant products "were honored with the first place in the annual 2006 Innovation Awards from *Home Improvement Executive,* the magazine geared to executive level readers in the home improvement industry."[22]

3.   The USDA National Wildlife Research Center noted that DEER AWAY "has been effective in several trials conducted by the Olympia Field Station."[23]

---

[20] Opposer's Brief, pp. 9-10.
[21] Opposer's fifth notice of reliance.
[22] *Id.*
[23] Opposer's second notice of reliance, Exhibit 5.

30

4.    A report from the University of Missouri, *Controlling Deer Damage in Missouri,* stating that "[DEER AWAY has been reported to be 85 to 100 percent effective in field studies."[24]  *See also* a report from the University of Nebraska, *Managing Deer Damage in Nebraska* (reported to be 85 to 100 percent effective);[25] a report from Cornell University, *Reducing Deer Damage to Home Gardens and Landscape Plantings* ("reported to be >85% effective").[26]

5.    The fact that DEER AWAY was referenced in many state agency and university studies.[27]

The documents are effective to show that DEER AWAY has been referenced in governmental studies and university sponsored articles, studies or reports, as well as two press releases, and the product has been reported to be effective. We cannot infer that the mark is famous or enjoys public renown because there is no evidence regarding the circulation of these press releases, reports, studies and/or articles.  Furthermore, DEER AWAY was one of many repellants identified in the studies and it was in no way singled out as a particularly well-known product.

---

[24] *Id* at Exhibit 20.
[25] *Id* at Exhibit 23.
[26] *Id* at Exhibit 40.
[27] Opposer's second notice of reliance.

In addition, applicant introduced opposer's DEER AWAY sales figures in both dollars and units sold.[28]  The information was designated as confidential and filed under seal so we may only refer to them in general terms.  It is not clear why applicant chose to introduce opposer's sales figures but, in any event, on their face the sales figures are not so substantial as to warrant an inference of extensive consumer awareness.  Moreover, because there is no context as to market share, the sales figures have little probative value in determining whether opposer's marks are strong.

On this record, we  find that consumers have not been widely exposed to the mark DEER AWAY and/or DEER AWAY PROFESSIONAL, or that the marks have otherwise become widely known and, therefore, can be considered famous marks.

B.   The similarity or dissimilarity and nature of the goods described in the application and registrations.

The goods in the application and opposer's registrations are legally identical.  Applicant is seeking to register its mark for "animal repellant used to repel deer and other ruminant animals and rabbits."  The goods identified in opposer's pleaded registrations are "repellant for repelling deer, other big game and rabbits."

---

[28] Applicant's notice of reliance, opposer's responses to interrogatory Nos. 11 and 12.

C.   The similarity or dissimilarity of likely-to-continue
     trade channels and classes of consumers.

Because the goods identified in the application and opposer's pleaded registrations are legally identical, we must presume that the channels of trade and classes of purchasers are the same.  *See Genesco Inc. v. Martz,* 66 USPQ2d 1260, 1268 (TTAB 2003) ("Given the in-part identical and in-part related nature of the parties' goods, and the lack of any restrictions in the identifications thereof as to trade channels and purchasers, these clothing items could be offered and sold to the same classes of purchasers through the same channels of trade"); *In re Smith and Mehaffey,* 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the same channels of trade, and be sold to the same class of purchasers").

D.   The conditions under which and buyers to whom sales are
     made, i.e. "impulse" vs. careful, sophisticated
     purchasing.

Opposer's products are sold through retail stores, catalog and mail order services and through the Internet to "anyone who buys or uses animal repellant," to protect plants trees and bushes.  The products sell in the range of $9.99 to $109.99, depending on the size or amount.[29]  Since there are no restrictions or limitations in applicant's

---

[29] Opposer's response to applicant's interrogatory Nos. 10, 20 and 21.

description of goods, we must presume that they too are sold to anyone who buys or uses animal repellant, including ordinary consumers.

However, the purchaser of deer repellant has a reasonably focused need for the product. Deer repellant is an unusual product in that it is not purchased by an individual consumer on a frequent basis. A single purchase of the product should suffice for a reasonably long period of time (*e.g.,* a season). Opposer advertises that "Just one application each season provides year round protection."[30] Opposer's label states that DEER AWAY "Repels Deer Up to 3 Months."[31] The directions instruct the user to "[a]pply a light dusting of powder to plants" and "[d]o not retreat new growth."[32]

If the damage done by deer is significant enough to require action, the purchaser would not indiscriminately purchase any product purported to be a deer repellant. The product would be selected after a reasonable investigation (*i.e.,* the consumer wants a product that will effectively solve the deer problem while not harming the plants). While the evidence shows that deer repellant may be inexpensive,

---

[30] Opposer's fifth notice of reliance, opposer's response to applicant's interrogatory No. 18, Document S-00041. *See also* Document S-00103-00106.

[31] *Id* at Documents S-00012, 00014, 00016, 00025, 00028. *See also* Document S-00032, 00040, 0043, 00049.

[32] *Id* at S-00020, 00022, 00031.

we are not convinced that consumers will exercise a low degree of care when purchasing the product. In fact, the problem of protecting plants and shrubs from deer is significant enough to warrant numerous governmental and university studies.

The evidence of record does not support opposer's contention that because deer repellant is sold at retail as an "off the shelf" product that consumers will exercise a low degree of care. Opposer has not met its burden of showing that this factor weighs in its favor.

E.  The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

We now turn to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *In re E. I. du Pont De Nemours & Co.,* 177 USPQ at 567. In a particular case, any one of these means of comparison may be critical in finding the marks to be similar. *In re White Swan Ltd.,* 9 USPQ2d 1534, 1535 (TTAB 1988); *In re Lamson Oil Co.,* 6 USPQ2d 1041, 1042 (TTAB 1988). In comparing the marks, we are mindful that where, as here, the goods are legally identical, the degree of similarity necessary to find likelihood of confusion need not be as great as where there is a recognizable disparity between the goods. *Century 21*

*Real Estate Corp. v. Century Life of America,* 970 F.2d 874,

23 USPQ2d 1698, 1700 (Fed. Cir. 1992); *Schering-Plough*

*HealthCare Products Inc. v. Ing-Jing Huang,* 84 USPQ2d 1323,

1325 (TTAB 2007); *Jansen Enterprises Inc. v. Rind,* 85 USPQ2d

1104, 1108 (TTAB 2007).

However, the similarity of the marks in one respect

does not automatically mean that the marks will be found to

be likely to cause confusion even if the goods are

identical.

> It should be noted that similarity of
> the marks in one respect – sight, sound,
> or meaning – will not automatically
> result in a finding of likelihood of
> confusion even if the goods are
> identical or closely related.  Rather,
> the rule is that taking into account all
> of the relevant facts of a particular
> case, similarity as to one factor
> (sight, sound, or meaning) alone "*may* be
> sufficient to support a holding that the
> marks are confusingly similar."  *Trak*
> *Inc. v. Traq Inc.,* 212 USPQ 846, 850
> (TTAB 1981)(emphasis added).  To the
> extent that the above cited statements
> from *General Foods Corp. v. Wisconsin*
> *Bottling, Inc.* [190 USPQ 43, 45 (TTAB
> 1976)] and *In re Mack* [197 USPQ 755, 757
> (TTAB 1977)] suggest that a finding of
> similarity as to sight, sound *or* meaning
> automatically results in a finding of
> likelihood of confusion when the goods
> are identical or closely related, said
> statements are hereby clarified.

*In re Lamson Oil Co.,* 6 USPQ2d at 1042 n. 4 (emphasis in the

original).

Applicant's mark DEER-B-GON is similar to opposer's

marks DEER AWAY and DEER AWAY PROFESSIONAL in that they all

36

start with the word "Deer" and they engender the commercial impression of getting rid of deer. However, since getting rid of deer is the purpose of the parties' deer repellant, the marks are highly suggestive. The fact that the marks have a similar highly suggestive meaning is insufficient to support a likelihood of confusion finding where, as here, the marks otherwise differ in appearance and sound. *Calgon Corp. v. John H. Breck, Inc.,* 160 USPQ 343, 344 (TTAB 1968).

The word "Deer" has no source-indicating significance in the marks at issue because the word "Deer" describes the subject that the product eliminates. While the marks must be compared in their entireties when analyzing their similarity or dissimilarity, there is nothing improper in stating that for rational reasons, more or less weight has been given to a particular feature of a mark. *In re National Data Corporation,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). Thus, in comparing the marks, overall DEER-B-GON and DEER AWAY are not similar in appearance or sound because B-GON and AWAY look and sound different.

The nature of the marks in this case are analogous to the marks SURE-FIT for slip covers and RITE-FIT for drapes and slip covers in *Sure-Fit Products Company v. Saltzson Drapery Company,* 254 F.2d 158, 117 USPQ 295, 296 (CCPA 1958).

> In reaching our decision [to dismiss the opposition] we have been most strongly

37

> influenced by the fact that the marks in
> issue, "Sure-Fit" and "Rite-Fit," are
> the weakest possible type of mark.  The
> word "Fit," aside from the third-party
> registrations in evidence, is eminently
> suitable for use in connection with
> goods such as ready-made slip covers,
> where proper fit is of the utmost
> importance.  We need not consider third-
> party registrations to recognize that
> the word is often used in connection
> with the sale of such goods.  The word
> is distinctly descriptive of a
> characteristic of the merchandise in
> connection with which it is used.
> Appellant's use of such phrases in its
> advertising material as "for perfect,
> lasting *fit,*" "for triple-sure *fit,*"
> "smooth, custom-like *fit,*" "a super-*fit*
> feature," "*fits* chairs of this type,"
> "to make smooth *fit* triple-sure,"
> "insures proper *fit*" and "this cover
> *fits* separate-cushion Cogswells," is
> indicative of this fact.
>
> The prefixes "Rite" and "Sure," when
> added to the suffix "Fit," do little, of
> course, to remove the terms from the
> descriptive category.  "Rite-Fit" is an
> obvious misspelling of "Right-Fit" and
> is clearly descriptive of a function of
> the goods with which the words are used.
> And though appellant has obtained a
> registration for this mark on the
> principal register as a secondary
> meaning mark, there is nothing in the
> record to indicate that this mark is not
> still in the category of a weak mark.

*Sure-Fit Products Company v. Saltzson Drapery Company,* 117

USPQ at 296.

In comparing the marks, in view of their highly

suggestive nature, we find that the differences in their

sight and sound outweigh the similarity in the meaning and

commercial impression such that consumers encountering the marks are not likely to be confused.

F.    Balancing the factors.

Having carefully considered the parties' marks in their entireties, and in light of the evidence adduced herein, we find that applicant's mark DEER-B-GON for "animal repellant used to repel deer and other ruminant animals and rabbits" is not likely to cause confusion with opposer's marks DEER AWAY and DEER AWAY PROFESSIONAL for "repellant for repelling deer, other big game and rabbits."  We are not convinced otherwise by the fact that the goods are legally identical and the channels of trade are the same.  First, we note our conclusion that opposer has not established that consumers will purchase the involved products on impulse or  without care.  In fact, the parties' deer repellant products are for a very specific purpose and purchasers will be particular about purchasing a product that suits this purpose. Moreover, as indicated above, opposer's DEER AWAY marks are highly suggestive and, as we have found above, sufficiently different from applicant's highly suggestive mark so as to be distinguishable.  Suggestive marks, in general, are not entitled to the same scope of protection as arbitrary marks. *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992), *quoting Sure-Fit Products Co. v. Saltzson Drapery Co.,* 117 USPQ at

39

296 ("where a party chooses a trademark which is inherently weak, he will not enjoy the wide latitude of protection afforded the owners of strong trademarks. Where a party uses a weak mark, his competitors may come closer to his mark than would be the case with a strong mark without violating his rights").

**Decision**: The opposition is dismissed.